LAZ–KARP REALTY, INC.

v.

James F. GILBERT.

Civ. A. No. 90–0162–B.

United States District Court,
D. Rhode Island.

Nov. 19, 1990.

Jeffrey C. Schreck, Flanders & Medeiros, Providence, R.I., for plaintiff.

Joseph V. Cavanagh, Karen A. Pelczarski, Blish & Cavanagh, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiff, Laz–Karp Realty, Inc., entered into a purchase and sale agreement with defendant, James F. Gilbert, on February 8, 1989. The agreement provided for the sale of land and buildings located in the central business district of the City of Providence. Laz–Karp was in the business of operating parking garages and planned to construct and operate a parking garage on the site.

Laz–Karp and Gilbert negotiated the purchase price of $4,500,000 in January of 1989. After the purchase price had been negotiated and agreed upon, Gilbert informed Laz–Karp that there were problems with the title to the property. Three persons (the "holdouts") who held fractional interests in a small part of the property had refused to sell their interests to Gilbert. Gilbert proposed to Laz–Karp that Gilbert clear title by having the City of Providence condemn the property.

Accordingly, the purchase and sale agreement, drafted by Gilbert's counsel, recited that:

> Buyer understands that Seller does not presently hold title to the entire Premises, that title to certain portions of the Premises is not marketable and that certain mortgages have been recorded against the Premises which can not (sic) be discharged by the payment of money. Buyer has been advised that the City of Providence through its Redevelopment Agency will condemn the Premises and convey marketable title to the Premises to Seller. If such condemnation has not been completed by March 1, 1990, Seller or Buyer may elect to terminate this Agreement by written notice to the other provided in accordance with the provisions thereof.

The agreement further provided that if either party terminated the agreement, Gilbert must pay to Laz–Karp the deposit and all earned interest and an amount equal to Laz–Karp's costs for tests and engineering work to determine if the property was suitable for construction of a parking garage, but not in excess of $100,000, provided Laz–Karp delivered to Gilbert proof of such expenses.

The agreement significantly provided that the closing would take place 60 days "... after the condemnation proceeding had been completed and all appeal periods had expired.... provided if the condemnation proceedings referred to above have not been completed and all appeal periods shall not have expired on or before Sept. 1, 1989 the Closing shall take place ninety (90) days after the condemnation proceeding referred to above has been completed and all appeal periods have expired."

Finally, the agreement also provided that both Gilbert and Laz–Karp would "use due diligence to complete their obligations ... on a timely basis."

Under the terms of the agreement, Laz–Karp had a 30-day free "window" to decide whether it wanted to go forward with the transaction. During this period, among

other things, Laz–Karp considered the condemnation aspect of the transaction. Laz–Karp's principals and counsel each testified at trial that Laz–Karp decided during this time that proceeding through condemnation had certain benefits. These included the possibility of acquiring an adjacent parcel of property in which Gilbert had no interest as well entering into a close working relationship with the City of Providence. Laz–Karp perceived that the City's participation in the purchase of the property would make it easier for Laz–Karp to get any needed zoning variances, permit approvals, and desired traffic changes, and might better enable Laz–Karp to arrange to connect its parking garage with a planned Convention Center. Gilbert vigorously disputes the existence of any benefits of condemnation and instead insists that condemnation was merely contemplated by the parties as the quickest way to clear title.

At meetings on the date of the closing in February, both the Director of Planning and Redevelopment for the City of Providence and the Mayor of the City of Providence expressed an interest in condemning the property for a parking garage. There was no discussion of restrictions on the property or reverter rights of the City at that time. Counsel for Laz–Karp, however, admitted at trial that it is common practice for there to be restrictions on land obtained through condemnation proceedings.

In late September of 1989, for the first time the City identified a series of conditions and deed restrictions necessary for condemnation. These conditions and deed restrictions included: 1. Laz–Karp must submit a detailed construction plan for the property; 2. If a garage was not built, the City had a right of reversion; 3. The property would be subject to restrictions on transfer by Laz–Karp to any other party; 4. The property would be restricted to use as a parking garage for 40 years; and 5. Any plans to construct a hotel in addition to a parking garage required approval by the Historic Review Commission.

By this time Laz–Karp had already paid a $100,000 deposit as required by a March 7, 1989 supplement to the agreement. Furthermore, Gilbert had evicted all tenants on the land in order to avoid paying tenant relocation charges.

Laz–Karp, however, thereafter concluded that because of the City's restrictions, condemnation was not economically advantageous to it. Laz–Karp, therefore, declined to submit the appropriate plans and specifications for the condemnation proceeding and the City declined to go forward with condemnation. Laz–Karp informed Gilbert of its decision on December 20, 1989.

Gilbert then suggested to Laz–Karp that he could obtain clear title by purchasing the minority interests in the land as an alternative to condemnation. On January 3, 1990 the parties discussed clearing title otherwise than by condemnation and lowering the purchase price to $3,750,000. Although the terms of this discussion were to supersede the original agreement if put into effect, the parties did not enter into a signed or written agreement.

In February of 1990, Gilbert obtained all minority interests in the land and demanded performance of the purchase and sale agreement. Laz–Karp contended that the original agreement was terminated due to Gilbert's failure to condemn the property and demanded return of the original $100,000 deposit and design fees of $10,000. Gilbert eventually sold the property to another purchaser for $3,750,000 and has filed a counterclaim against Laz–Karp for damages.

The dispute between the parties concerns whether condemnation was required under the original purchase and sale agreement and whether, assuming condemnation was required under that agreement, Laz–Karp had any obligation to submit the requisite construction plans for condemnation. The parties also dispute whether the city restrictions made condemnation impossible and whether the parties entertained a mistaken assumption that there would be no such restrictions. Because the court holds that Rhode Island law imposes no obligation on Laz–Karp to take affirmative action to effectuate condemnation, the is-

sues of impossibility and mistake need not be addressed.

## Discussion

■ Gilbert contends that under the original purchase and sale agreement condemnation was not the exclusive method by which to clear title. Instead, Gilbert argues that the termination clause regarding condemnation was based on the erroneous understanding of the parties in February of 1989 that title could be cleared quickly only through condemnation and could not be cleared by buying out the holdouts. In effect, Gilbert argues that condemnation was not a condition precedent to conveyance of the property.

This argument flies in the face of the plain and unambiguous language of the purchase and sale agreement. The purchase and sale agreement clearly provides that either party can terminate the agreement if condemnation did not occur by March 1, 1990. Furthermore, the only provision in the agreement concerning the date for closing depended entirely and solely upon condemnation. There was to be no closing unless there was a condemnation.

■ Under Rhode Island law, clear and unambiguous language in a contract controls its interpretation and governs its legal consequences. *See, e.g., Chapman v. Vendresca,* 426 A.2d 262, 264 (R.I.1981); *Theroux v. Bay Assocs., Inc.,* 114 R.I. 746, 339 A.2d 266, 268 (1975). Because the language in the purchase and sale agreement unambiguously allows either party to terminate if condemnation had not occurred by March 1, 1990 and condemnation did not occur by that date, Laz–Karp was entitled to terminate the agreement. The benefits of condemnation perceived by Laz–Karp are not illusory. Understandably, the City would be considerate of a project which it itself spawned. Condemnation might well have made Laz–Karp's project more likely to succeed. But, even if no special benefit flowed from condemnation, the parties had agreed upon it as the course of action. The parties' agreement, as reflected in the plain language of the contract, must be followed.

■ Gilbert next argues that if condemnation is a condition precedent to conveyance, the failure to condemn is excused because it was Laz–Karp's refusal to submit the requisite construction plans which made condemnation impossible. Gilbert further argues that Laz–Karp violated an implied covenant of good faith and fair dealing by refusing to submit plans. This is essentially the same argument and, under either formulation, the argument depends upon whether or not there was an obligation on the part of Laz–Karp to participate in any fashion in the condemnation proceedings.

■ The Rhode Island Supreme Court has recognized that there is "an implied covenant of good faith and fair dealing between parties to a contract so that contractual objectives may be achieved." *Ide Farm & Stable, Inc. v. Cardi,* 110 R.I. 735, 297 A.2d 643, 645 (1972). This duty to use best efforts to fulfill contractual objectives, however, presupposes that an obligation exists. In *Ide Farm,* a somewhat ambiguous purchase and sale agreement conditioned the purchaser's obligation on the purchaser's ability to obtain a mortgage. 297 A.2d at 645. After acknowledging the existence of an implied covenant of good faith and fair dealing, the state supreme court held that the purchaser had satisfied that duty by contacting several banks and actually making application for financing to one bank without success. *Id.* In *Ide Farm,* the purchaser was clearly the party to the contract with the duty to fulfill the condition to obtain financing.

In the present purchase and sale agreement, however, Laz–Karp had no obligation to participate in the condemnation of the property. Gilbert is unable to point to any language in a very specific sixteen page agreement or a five page amendment which by any stretch of imagination creates such a duty.

The Rhode Island Supreme Court has construed termination clauses quite similar to the termination clause involved here and has determined that a party need not take affirmative steps to ensure that the condition precedent to termination does not oc-

cur. *See Chapman*, 426 A.2d at 264; *see also King v. Knibb*, 447 A.2d 1143, 1146 (R.I.1982) (agreement conditioning conveyance on seller's ability to obtain good title did not require affirmative action on the part of the seller to extinguish outstanding title defects).

In *Chapman*, a real estate purchase and sale agreement provided that if the lot to be sold was not available for construction by a certain date, the seller could return the buyer's deposit without further obligation. The seller refused to subdivide the land after the town conditioned subdivision approval on costly installation of town water. On the specified date in the agreement, the land was not ready for construction, and the seller returned the deposit. In rejecting the buyer's claim for specific performance, the Rhode Island Supreme Court held that the language of the agreement should be enforced as it was written. The court observed that there was nothing in the agreement which obligated the seller to create a subdivision to make the property suitable for construction. According to the court, "the seller had in effect the option of implementing a subdivision plan by May 1 ... or returning the deposit." 426 A.2d at 264. The court pointed out that there was no allegation or evidence of "fraud, bad faith, illegality, misconduct, or any other factor" that justified non-enforcement of the terms of the agreement. *Id.*

A comparable situation exists here. The original purchase and sale agreement provides that the City of Providence must condemn the property by a certain date, or the agreement is terminable by either party. The only obligation expressly imposed upon Laz–Karp under the agreement is to use "due diligence" to perform in a timely manner whatever obligations the agreement created. The agreement did not impose any obligations on Laz–Karp with respect to condemnation. Furthermore, there is no serious allegation or evidence of bad faith that would excuse performance of the terms of the agreement. If dropping subdivision plans because of the increased costs of town water was not bad faith in *Chapman*, 426 A.2d at 264, it is difficult to see how Laz–Karp's refusal to submit development plans due to economically disadvantageous city conditions could amount to bad faith here.

Therefore, in accord with the express agreement of the parties as recorded in the purchase and sale agreement, the defendant James F. Gilbert must return to Laz–Karp the $100,000 deposit as well as $10,000 in design fees plus interest. Gilbert's counterclaim for $839,419.96 is denied and dismissed.